UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 4:11 CR 246 CDP |
| TIMOTHY BALLE (5), | ) ) | |
| Defendant. | ) ) | |

# FINDINGS OF FACT, CONCLUSIONS OF LAW, and SENTENCING OPINION

At the April 16, 2013 sentencing hearing, I imposed a 96 month sentence on defendant Timothy Balle. This opinion sets out my findings of fact on contested factual issues, my conclusions of law regarding the advisory sentencing guidelines, and my rationale for selecting the sentence. My findings are based on the preponderance of the evidence presented at trial and at the sentencing hearing. Except as set forth here, I adopt the findings of fact and legal conclusions set out in the presentence report (PSR). The numbering below corresponds to the paragraph numbers within the PSR.

25 - 26: Paragraphs 25 and 26 are accurate.

27: The phrase "*and enrich the members and associates through criminal activity*" is stricken from Paragraph 27. Paragraph 27 is otherwise

accurate. Members paid dues, and some members sold drugs and guns, but there was no evidence that this money-making criminal activity was a specific purpose of the organization.

28: The next to last sentence of paragraph 28 is stricken, and the following sentence is inserted in its place: "*A small percentage of WOS members have achieved 1%er or diamond status, which is a term used to describe members of OMGs who are represented to others as being members who routinely engage in significant criminal activity.*" Paragraph 28 is otherwise accurate. The evidence showed that wearing a 1%er or diamond patch was s a status symbol conferred more by reason of rank or favor within the organization, than because of proof of actual criminal activity. The evidence also showed that WOS members intended that 1%er or diamond patches be perceived by others as evidence that the wearer routinely engaged in criminal activity.

34: Paragraph 34 is accurate. Balle carried out the August 10, 2009 armed robbery at the direction of Dominic Henley, President of the St. Louis WOS chapter. The victims were not members of any outlaw motorcycle club, but were simply people who rode motorcycles as part of an organized, law-abiding group. Timothy Balle pointed a gun at close range at the female victim and told her to comply with Henley's demand that she turn over her vest.

35: Paragraph 35 is largely accurate. With regard to the August 15, 2009 shooting incident, Balle was found not guilty of murder and of discharging a firearm in connection with a crime of violence. A self defense instruction was submitted to the jury, and the jury found Balle not guilty. But even if this shooting is not technically a homicide, Balle bears responsibility for Kevin Berry's death. The evidence showed that both Henley and Balle went to the bar armed; Henley got into a dispute with the victim, Kevin Berry, and as the argument escalated, both eventually drew weapons. Balle had been directed to provide protection to Henley, and he did so by joining in the gun battle. Both Henley and Balle shot Berry. Two witnesses who were involved in the shoot-out – Andre Davis, a friend of Berry's, and Lawrence Pinkston, a WOS member – testified to these events and were entirely credible. Berry was killed; Henley and Balle were both shot.

With regard to Balle's later sale of the firearm to a WOS member (which forms the basis for the Count 7 conviction), I agree that the evidence does not support a finding that Balle intended the firearm would be used to retaliate for the August 15, 2009 shooting. It is equally likely that Balle understood the firearm would be used for self-protection, because both Balle and the person to whom he sold the gun had a reasonable fear of retaliation. But I also find that

Balle did intend that the firearm would be used in some felony, given his knowledge of the buyer's drug and other criminal activities. Therefore in the last sentence the phrase "*intending that the rifle would be used to retaliate for the August 15, 2009, incident in which Balle and Henley were shot by a rival OMG member*" is stricken from Paragraph 35. The following sentence is added to Paragraph 35: "*When Balle sold the rifle to the WOS member, he believed and intended that the member would use the firearm in other criminal activity, whether drug trafficking or some other felony*."

48: Paragraph 48 is accurate.

49: The fifth, sixth, and seventh sentences of Paragraph 49 are stricken, as the evidence does not support the assertion that Balle was involved in witness tampering, although Henley did tell another WOS member that he could regain his colors by killing Andre Davis. With those sentences omitted, Paragraph 49 is otherwise accurate.

Paragraphs 62, 71, 77, 84: <u>Obstruction of Justice</u>: I sustain Balle's objections to the obstruction of justice enhancements under § 3C1.1. Law enforcement intercepted two letters Balle sent from jail while he was detained pending trial. The first letter was to a relative and makes reference to a "big cross out party," and asks the relative to "Let me know if anyone is approached

by anyone." The second letter was to a WOS member in Houston, Texas, who the government believes holds the role of "Enforcer." This letter lists a number of WOS members who were involved in the August 10 and August 15, 2009, incidents, with a big X through all the names. The members' club names and actual names are listed, and next to one is the phrase "St. Louis Free." Among other things, the letter says, "It's time for Wheels to be Wheels." It also says, "Send Club lawyer to see me. I need people on the outside." The letters also make reference to the Court's having ordered Balle to give a DNA sample. The government argues that these letters show that Balle was attempting to get someone to kill the listed persons. This is speculative, at best. It is more reasonable to assume that the letters reflect Balle's desire to have an outside lawyer, perhaps because he was unhappy with his public defender's failure to prevail on the fight over whether he had to give a DNA sample. The reference to the case being a "big cross out party" could be interpreted (to the extent it can be interpreted at all) to mean that various of the WOS members might plead guilty and testify against Balle, which, of course, is exactly what happened. The government has not met its burden of showing, by the preponderance of the evidence, that Balle obstructed justice or attempted to do so.

  67 through 92: <u>Guidelines Calculations</u>: The PSR calculates three groups

of acts for calculating the guidelines. Group 1 is the armed robbery. As I have sustained the objection to the obstruction of justice enhancement shown in Paragraph 71, the Adjusted Offense Level for Group 1 and shown in Paragraph 72 should be 25. Group 2 lists Racketeering Act 2 as Tampering with a Witness. I agree with Balle's objection that there is no evidence to support this group, as there is no evidence that Balle tampered with a witness or evidence. Paragraphs 73 through 78 are therefore stricken from the PSR. Group 3 is for the sale of the firearm to a previously convicted felon. As I agree that Balle did not transfer the firearm in connection with any murder conspiracy, the cross reference under §2X1.1(a) referred to in Paragraph 81 does not apply, and that paragraph is stricken. For the same reason, the words "*namely conspiracy to commit murder*" are stricken from Paragraph 80. As I have sustained the objection to the obstruction of justice enhancement in Paragraph 84, the Adjusted Offense Level for Group 3 and shown in Paragraph 85 should be 18. The multiple count adjustments in § 3D1.4 apply as follows: Group 1 is the highest offense level at 25, and receives one unit. Group 3 has offense level 18, which is 7 levels below Group 1, which receives ½ unit. For 1 ½ units, one level is added to the highest offense level, for a Total Offense Level of 26. Balle is in criminal history category I, so his advisory guidelines range is 63-78 months.

127:   Paragraph 127 should read: "***Guideline Provisions:** Based upon a total offense level of 26 and a criminal history category of I, the guideline imprisonment range is 63 months to 88 months..*"

<u>The Sentence Selected</u>:

I sentenced Balle to 96 months on each of counts 1 and 7, with the sentences to be served concurrently.  This is an upward variance from the guidelines range because I believe the guidelines range is not sufficient to meet the sentencing purposes set out in 18 U.S.C. § 3553(a)(2).  Although Balle's involvement in the WOS criminal enterprise was limited in time, the recordings played at trial showed that he joined the operation only after being told, repeatedly, that the WOS was an outlaw organization, that he would be expected to carry a gun, that he would be required to protect other members and fight for them if necessary, and that he would be required to follow directions of more senior members and officers.  He indicated his willingness to follow these rules and stated he was in the process of obtaining a gun, even though he was a convicted felon who was prohibited from possessing a firearm.  When his chapter President, Dominic Henley, told him that they needed to take the vests in the August 10, 2009 incident, he immediately pointed his gun at close range at the female victim in a crowded bar and forced her to relinquish her vest.  Less

than a week later, he again went to a biker club armed with a firearm, and this time engaged in a shoot-out that left Kevin Berry dead.  His eagerly embraced the outlaw motorcycle gang culture by following Henley's directions, carrying and using a firearm, and engaging in violent acts to further the reputation and status of the WOS.  Later he obtained and sold an assault rifle to a person he knew was a convicted felon and who he believed was a drug trafficker.

Balle was in his late 50s when he began this association with WOS.  Although he had some previous criminal convictions, they were all for crimes that took place long ago, and his only felony conviction was a burglary committed when he was 17 years old.  He had worked as a truck driver, and according to the PSR, had generally been a law abiding citizen for several decades.

The nature and circumstances of Balle's crimes in this case are very serious, and his actions contributed to the death of Kevin Berry.  The 96 month sentence reflects the seriousness of the crime and should promote respect for the law and provide just punishment.  It should also send a deterrent message to Balle and to others, and it meets the sentencing goal of incapacitation, to protect the public from further crimes of the defendant during the time he is incarcerated.  A sentence within the advisory guidelines range would not be

sufficient to meet those goals. The higher sentence is also necessary to avoid unwarranted sentencing disparities, as Balle's conduct is more egregious than that of many of the co-defendants in this case, and he should not receive a lower sentence than persons who were not involved in such serious actions on behalf of the WOS.

**IT IS HEREBY ORDERED** that the Clerk of Court shall docket this opinion separately in the public file, and shall also attach a copy of it to the Presentence Report that is filed under seal, so that it will accompany the report that is provided to the Bureau of Prisons or is otherwise lawfully disseminated. The Clerk of Court shall also attach a copy of this Opinion to the sealed Statement of Reasons.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 17th day of April, 2013.